Case number 15-4182, Allied Erecting v. United States Steel Corp, oral arguments not to exceed 15 minutes per side, Mr. Christopher Opelinski for the appellant. Good morning, may it please the court, once again my name is Chris Opelinski, I am here for the appellant Allied Erecting, I would like to reserve 5 minutes for rebuttal. Allied is in bankruptcy, right? Correct, your honor. Chapter what, 11? Chapter 11. So who are you representing exactly, the trustee or the, what, who? Under the bankruptcy plan the litigation was carved out and Allied is in charge of the litigation, we solicited approval of the bankruptcy court to participate and handle this appeal on their behalf, so we're handling it directly for Allied. For the corporation itself and its executives? Correct. You're getting your instructions there if you need them? Correct, your honor. Okay, thanks. I am here to address two issues that we believe were improperly taken from the jury. I don't intend to address the basement concrete issue, although $700,000 it is much less than the first two issues and we believe the issues are well stated in the brief. I'd like to focus primarily on the statute of limitations claims in which our claims 3, 4, and 5 were dismissed and if I have additional time get to the manufacturing service agreement which was decided on summary judgment. We believe the court erred in three material respects in dismissing these three significant claims that totaled in excess of $30 million. Number one, we do not believe the court properly interpreted the operative agreements. Number two, we do not believe the court looked at the evidence in the light most favorable to Allied, the non-moving party. And then number three, the court didn't recognize that there are distinct differences between these three claims, claims 3, 4, and 5 and hence the accrual dates that apply to each of the three. Net, while the court believed that the three year schedule started on January 04 and the project should have been completed by January 07, we believe that was incorrect. We believe the evidence, the overwhelming evidence and certainly the evidence looked at most favorable to Allied would show that the three year schedule did not commence until July of 06. Three years ran to July of 09 and these claims were hence timely. What is it that you think happened in July of 06 that caused that to be the beginning? The notice to proceed was issued. The notice to proceed was in evidence. It's a memorandum that was issued by the project manager Tony Nuzzo which gets to the central issue. There are two documents and two actions that must take place before Allied can start. We believe that the court misconstrued and in fact ignored one of the operative documents. There's two documents. The so-called AIP or the settlement agreement is the document that says any work that the will be made available to Allied. That's the so-called internal corporate resolution. There's no question that happened in 03. However, number one, that's an internal document but more importantly, that document does not address the start of the project or the duration of the project. In fact, the AIP, the settlement agreement says the projects will be awarded and performed by Allied pursuant to the fair list contract. It's the fair list contract that is the second document that was ignored by the court. If you look at the fair list contract in particular section 3 and it's interesting. The lower court references section 3 but never quotes the language. U.S. Steel references section 3 but never quotes the language. Section 3 requires receipt. Section 3 of what? Section 3 of the final conformed specification. And what year is that? Excuse me? What year was that? I'm looking at the 1992 specification. Is that what you're talking about? Yes. It's called the 92 or the final conformed specification. If you look at section 3 of that time schedule, it says work on each phase shall begin within five days after Allied has received notice to proceed. And then will be worked on a continuous basis for three years. The court ignored this second document. But that paragraph that you sort of alighted over, which is two paragraphs down, work on each phase of the work shall be completed within three years after U.S.S. has authorized Allied to begin work. Right? So the authorization you're saying means it has to mean notice to proceed? Correct. Obviously the third paragraph refers to the first paragraph. We're given notice to proceed and then we must proceed within five days. We must complete in three years after we've been authorized. The authorization is referred to up above. It has to mean that. It has to be internally consistent. And, in fact, when this document was prepared back in 1992, the 03 AIP wasn't even in existence yet. So the authorization that they're talking about is this authorization. Who prepared these documents? The counsel for USD or who prepared these documents? The parties jointly prepared the documents, Your Honor. The AIP was negotiated between the parties. The Operative Settlement Agreement 03 in the 92 specification was negotiated between the parties. Counsel, as I understand your argument, you're saying that the accrual for the delay claim occurred at the end of the three-year period. Correct. Now, why is that? Why didn't the accrual occur when the first delay happened?  The issue and the nuance of construction litigation is this. When you've got an extended contract period, a three-year period, if you're delayed in month five and there's a four-day delay, that doesn't necessarily mean that you're not going to make the end date. In construction, oftentimes there is float in schedules and or work can be accelerated or work can be compressed. And so it's very frequent in construction litigation that schedules need to be adjusted. And just because a delay happens in day one, month one, or year one doesn't mean you're going to overrun the date. Okay. And then for count four, that removed facilities claim, it looks pretty clear to me that they didn't remove any facilities until 2009. Is that correct? Precisely, Your Honor. Okay. The fundamental difference here is the judge conflated these issues and thought they were all schedule issues. Claims four and five are scope issues. When did U.S. Steel remove something from our scope? And as Your Honor has indicated, the removal of the facilities didn't even happen until 2009, 2010, and 2011. What about count five, your ownership claim? Count five is a- What do you have after July of 2008 that occurred that would make that timely? Allied owned the rail and the non-ferrous under the terms of the specification. And so it was in Allied's column up until 2012. U.S. Steel asked U.S. Steel because there is both an operating facility and a decommissioned facility. So with regard to the underground non-ferrous and the rail, a determination needs to be made which rail totally services the dead facility, which is needed for the live facility. We needed that determination. So we went to U.S. Steel in 2011 and said we're ready to remove this rail that we own. We're ready to remove the underground non-ferrous. Tell us which can be removed, which has to stay. We weren't given that determination. We believe that cause of action didn't occur until 2012 when they denied our ability to take that. It never existed before. I want to go back to count three about the delay damage. It seems to me the two things you have to get over are this testimony that John Raymond gave regarding work beginning in January of 2004. How do you address that? Precisely, Your Honor. As the court knows, the evidence needs to be looked at in the light most favorable to us with all reasonable inferences. Allied's theory of the case, the facts, and the contract show no inconsistency. The court was conflating, and U.S. Steel, we believe, is attempting to conflate two separate issues, ownership of scrap with scheduled delay. On the commencement issue, under scrap ownership, the final conformed specification provided that two things happened and then Allied owned the scrap. One, the asbestos had to be completed, and two, Allied had to commence work in any facility. We showed that through certain preliminary work that we did, we commenced work, and hence we own these facilities for purposes of the ownership claim. Schedule, on the other hand, says under Section 3, the base scope dismantling work does not start until we're given a notice to proceed, and we were given the notice to proceed in July. The best analogy, Your Honor, would be I offer to paint your house on the inside, and I say, but I'm not going to patch the drywall. I'm not going to move the furniture. The owner then says, well, can you do that patching? Can you do that furniture removal as an extra? We do. We do that for a couple of weeks, and then we start what I'll call the base scope painting a month later. Clearly, the base scope painting is what we were given a month for. Did we do preliminary incidental work at the owner's request that was an extra? Yes, but that's not the base scope dismantling for which the three-year schedule applies. And, in fact, that work was all done pursuant to separate purchase orders. And so there's no inconsistency. There's no dancing. We did preliminary work at U.S. Steel's request on an extra basis as a predicate to starting our work. Now, part of the confusion is we need to take a look at what that work was. I don't understand the statements by Raymond that he says that it was all released, all authorized, on November 17, 2003. What is he referring to? He's referring to the corporate authorization. The problem here, Your Honor, is the corporate— That would seem to be the critical authorization. Well, no. There's two documents. There's the corporate authorization that releases the facilities at the corporate level that says— As a matter of fact, the corporate authorization doesn't even award it to Allied. It just says, U.S. Steel, you can dispose of these facilities. The problem, Your Honor, and we believe the confusion is this. The AIP, when talking about the corporate authorization, says anything authorized at the corporate level will be given to Allied. The notice-to-proceed language also says after the notice-to-proceed, Allied will be authorized to proceed. I think the unfortunate problem is there's the word authorization in these two different documents, but they're two different documents. So what Mr. Raymond was testifying to was that the corporate authorization authorized and released all these facilities to Allied. That's a fact. Allied agrees with that. That happened in November of 2003. We didn't receive the separate notice-to-proceed until July of 2006. And I would— So what were you doing before July of 2006 then? We were doing the preparatory work. There were three primary things that had to be done. Number one, equipment had to be moved out of these facilities before the buildings could be dismantled. Number two, there were live utilities running through all these facilities that had to be taken down. And number three, there were hazmats and asbestos that needed to be removed. None of those were included in our scope of work. They all had to be done before Allied could start sheeting tin in July. And so they asked Allied to assist in connection with this work to allow Allied to start. And if the court looks at the evidence that we summarized, all of the evidence is consistent with this. There was an established demolition plan that was issued by U.S. Steel in January of 2004, shortly after the corporate release, that says, it's going to take us about a year and a half to get these utilities removed. The utilities are finally removed. U.S. Steel then applies for a building permit, not until May of 2005. And they say, we're going to be starting soon. Allied then has to apply for the DEP asbestos removal permit, which it does in 2006. And it says, we think we're going to be starting in June of 2006. Allied then starts the day that they get this notice to proceed. And, in fact, the kickoff meeting for the sheeting tin facility is held two weeks later in August of 2006. It all fits. We would contend there's not one shred of evidence that's inconsistent with this theory of the case, which we believe the court did not focus on. How does the 92 construction contract Article 3 apply, which says in 3.1 should contractor be delayed by owner, which it sounds like that's what you're saying, that there are all these things that the owner had to do. Correct, Your Honor. Owner will, at contractor's request, extend by written order the work schedule. Was there any extension by written order of the work schedule? There was not, but there did not need to be in this sense, Your Honor. Typically, in construction contracts, you seek an extension of time or written extension of time to avoid an imposition of liquidated damages by the owner, where the owner will say you're beyond, you're late. There was an acknowledgment here this wasn't Allied's problem. So they didn't seek a formal extension because there was no contest at the field level that Allied was being delayed. That provision allows Allied to seek additional compensation. In 2011, U.S. Deal requested Allied submit your claim for additional compensation. That was not denied until 2012. We believe, although we think at the earliest the statute of limitation applies at the conclusion of the as-planned time period in July, I believe more properly there was no breach by U.S. Deal until it denied payment that it owed under Article 3, not until 2012. So net-net, these were compensable delays. U.S. Deal requested a claim, and we submitted that claim. They denied it, and that's what led to this litigation. Now, I wasn't given an opportunity to get to the manufacturing service agreement, but I see my time is up. Thank you. Good morning. May it please the court, I'm Michael Glattman on behalf of United States Steel Corporation. We're asking this court to affirm the district court's rulings in three respects, granting U.S. Steel summary judgment on its manufacturing counterclaim, granting U.S. Steel judgment as a matter of law on counts 3, 4, and 5, and finally granting U.S. Steel's motion to amend the judgment to correct a clear error of law on damages after the trial was over. Could you address the problem of what we do about the non-refundable language for the $10 million? As I understand it, the district court granted summary judgment for U.S. Steel on that question. Is that right? That is correct, Your Honor. It is true that there's two key provisions at issue in the party's 2004 AIP that go to the very heart of this summary judgment issue. The first one says, quote, in consideration of Allied's agreement to perform manufacturing work at Allied's facility in Youngstown, Ohio, U.S. Steel shall pay Allied a non-refundable advance payment of $10 million. It goes on from there. But the parties in the next section stated U.S. Steel would recover the MFG advance payment over the 120-month term of the agreement through discounts on the manufacturing work. Now, Allied's briefs fail to quote or mention these two critical provisions, let alone address them. The summary judgment record, Your Honors, was What is a language non-refundable supposed to refer to then? If it's not really non-refundable, it's what? Yeah, so it's non-refundable, but it's recoverable. And I guess my response to that is a few things. It could have been non-refundable in the instance that U.S. Steel had not performed. This is non-refundable in the same analogous situation. If I go buy a house as the buyer and I give a non-refundable deposit of $1,000 and I don't perform, the seller can keep it. But if the seller doesn't perform, the seller can't say, I get to keep your non-refundable deposit. It's for the protection of the seller. It doesn't allow the seller to breach and then keep that non-refundable amount. Let me ask you, what is it that U.S. Steel was performing here? What kind of manufacturing work was offered to Allied for it to do? There was no manufacturing work offered, Your Honor, because the simple fact that U.S. Steel was in constant contact with Allied. When is your manufacturing facility going to be ready? And it was never complete. In fact, as we sit here today through the bankruptcy proceedings, it never got complete. So to offer any would have been a fewer gesture. What was it supposed to be? What was Allied supposed to be manufacturing? It's manufacturing and fabrication of certain steel products that U.S. Steel was going to offer them work to do. They're building this facility that will allow them to fabricate. Can you say kind of what it is that they would have made? It's two types of things. It's machining and fabrication of steel that U.S. Steel would produce and then have Allied manufacture and turn into other types of products. Okay. The summary judgment record established three things in an uncontroverted fashion. First, U.S. Steel paid Allied the $10 million payment in July of 2005. No dispute. Second, Allied never completed construction of its manufacturing facility. And U.S. Steel never recovered any of the $10 million that it paid in advance through discounts. Did U.S. Steel offer manufacturing work to Allied? Or was this something that Allied was supposed to know what U.S. Steel wanted Allied to manufacture? The party's agreements made clear the type of the manufacturing work that would be subject to being requested from Allied. But because the parties were in contact, U.S. Steel knew the facility never got completed during the 11-year term of the contract. So any request for performance would have been futile at that point in time. Certainly U.S. Steel had massive amounts of manufacturing and fabrication work. Now, Allied, as I understand it, is saying that U.S. Steel had the obligation to have proof of what kind of manufacturing work it would have offered if it had the opportunity. Does U.S. Steel agree with that? Or if not, what's your basis in the law for why? No, the appropriate remedy for repudiation, and this is under Restatement of Contracts, Section 373, is restitution. The return of the $10 million advance payment. And that's precisely what the award was from Judge Loy. Now, Pennsylvania law establishes that merely calling an act itself said it was not returnable. I don't, I mean, it's very confusing to me. Sure, Your Honor, it's nonrefundable, but the next paragraph says it shall be recovered through discounts on advance payments. And the best case that I can point you to in this regard is a Pennsylvania Supreme Court case called Mosser Company v. Cherry River Boom. It's remarkably on point. And in that case, Mosser paid Cherry River $150,000 advance payment that was to be recovered through discounts of $1 per ton on bark purchases. Before Mosser was able to recover the entire $150,000, they ran out of trees on Cherry Boom's property. And so the Pennsylvania Supreme Court said that the advance payment had to be returned because that advance payment was to protect in the event that the buyer didn't perform, not in the event that the seller couldn't perform. And that had a nonrefundable language in it? I don't remember the specific, I'll be honest, Your Honor, the case, if it says nonrefundable. Doesn't that make a big difference to put in the contract that it's nonrefundable? Well, let me give you a- At least there's some ambiguity as to what that means. Sure, let me give you a second case that actually does deal with a nonrefundable advance payment, and that's Saruf Trading v. GE Fuel Cell Company. And that deals with a nonrefundable advance payment that was deemed to be recoverable and not kept by the party receiving it just because they didn't want to perform. The district court rejected Allied's contention that you could call the manufacturing payment nonrefundable and then just say we don't have to do anything and we can keep the $10 million. That was Allied's litigation position. By failing to complete the manufacturing facility and by failing to give adequate assurances to U.S. Steel, the district court that Allied had reputed its obligations. The district court also appropriately rejected Allied's related arguments about other consideration through the satisfaction of this gross margin commitment. What Allied's arguments miss in that regard is U.S. Steel bargained for discounted manufacturing work in addition to these other elements. So we believe- So the $10 million is not part of the $63 million. Is that correct? So the way the party set up their agreement, it's a little bit confusing. So U.S. Steel promised 25 years ago they'd do this, and now we're supposed to puzzle through it and straighten it out. So, yeah, there's 10 interrelated contracts in this case. So it can be, I'm sure, a little bit overwhelming on first blush. But what the gross margin commitment meant was U.S. Steel would give Allied $157 million worth of work over 10 years. 40% margin means that Allied's going to make $63 million. The parties agreed that the $10 million advance payment would count towards that $63 million. I believe that was your question. Yeah, so does this mean then that instead of getting $63 million, Allied is only going to get $53 million? Well, that would have been the case except for the following. The record established that U.S. Steel, it turned out, gave Allied far in excess of $63 million. I believe it was $20 million more than the $63 million. So whether or not you counted the $10 million, Allied got their gross margin commitment amount. I would like to turn, if it's okay, Your Honors, to the question about directed verdict. Judgment is a matter of law and counts three, four, and five. And I guess I would start with the fact that this court does not need to consider the propriety of that decision. Allied has waived its right to appeal the district court's determination on directed verdict by failing to address all of the bases for the district court's ruling. But the district court didn't give any explanation for saying I agree with all of U.S. Steel's points. There's zero analysis there. The district court, and I think this is what you're going to, but to put it in context, said for all of the reasons stated by U.S. Steel in its Rule 50 motion, at the end of plaintiff's case, I'm going to grant this motion. In addition to making that statement, she did lay out three of the specific reasons in her opinion and order and stated unequivocally that all of the arguments have merit. And those three arguments, those alternative bases that were set forth in her opinion were the following. First, the district court identified Allied's failure to provide written notice related to its count three delay and disruption claims. And, Your Honor, that's what you were asking Mr. Opelinski about on the 92 construction contract, that provision that says, I believe it's section 3 or 3.1, that you've got to give written notice if you're going to make a claim for delay or disruption. And that's what Judge Loy found, that Allied had not presented any evidence of giving that written notice and therefore those claims were barred. That was one of her alternative. So you're saying that the reading of that provision 3.1 is that Allied has to give notice? Yes. Allied has to give notice in the event that they want to seek an extension of the three-year schedule that was running. It says owner will, at contractor's request, extend by written order. And I thought the owner was U.S. Steel. Am I reading this correctly? Owner is U.S. Steel, but it has to be at contractor's request, and that's Allied's request. Right. And then there has to be a written order. Right. Signed at that point. So Allied has to make the request for the extension, then U.S. Steel has to give them the written extension. The request was never made, and that's one of the bases that Judge Loy said, you've got a problem, Allied, in addition to statute of limitations. So it's not you – I wrote down that you said Allied failed to provide written notice, but Allied could say ask orally, right? I don't believe that that's the case, Your Honor. At contractor's request doesn't say it has to be in writing. Fair enough. Looking at that provision, that's fair enough. I will tell you this, there's nothing in the record that suggested that Allied made any requests at all, and there's certainly no evidence that was submitted that U.S. Steel granted a written order extending the time for this performance. Secondly, the district court mentioned that one of the alternative bases was the failure of Allied to put up any admissible evidence of damages on their counts three, the measured mile issue with Mr. Gleason, who was excluded at a trial, Daubert motion, and third, the district court noted in her opinion and order that Allied had failed to put forth any evidence that it generated scrap, which was a requirement in the party's 2003 AIP and 2004 DSA, before they could own the facilities, the buildings, the railroad track, the basements they claimed to own. So for all of those reasons – So the first two apply to count three. Failure to give written notice is a delay and disruption issue. The failure to put on damages of their delay and disruption relates to count three, and count four and five are covered by this notion, you didn't put on any evidence that you generated scrap. Did Allied do any dismantling? They did. Then of course they generated scrap, right? I mean, what else are they generating? They generated scrap. They got that scrap, Your Honor. It's on the remaining things they're claiming that U.S. Steel took back, that they weren't allowed to dismantle the buildings that were still standing at the end. Allied says, well, wait a minute, we own those. But the problem is the party's contracts unequivocally state you have to generate scrap. You have to take down the buildings before you own them. That's a trigger. And where do you get that? In which contract and which provision? Sure. That is in two contracts, 2003 AIP. And if you give me one second, I can give you the section of that. I believe it is 2B7, but I want to make sure. 2B7. 2B7. Thank you, Chris. It says. Allied will own all ferrous and non-ferrous scrap generated on any projects award to Allied? That's correct, Your Honor. And it's also a parallel provision is in the 2004. Why does that say? So you say that means they have to have generated it in order to own it? That's correct, Your Honor. And, in fact, Mr. Raymond testified as to what it means to generate scrap, and he said it means to tear down the building. That's a prerequisite to the ownership. This notion that Allied has put forth that the district court improperly incorporated by reference U.S. deals arguments on these alternative holdings is also without merit. This court in United States v. Holland said, quote, to the extent that Holland argues that the district court committed legal error by incorporating the government's brief by reference, his argument must be rejected. And that's what Judge Loy did here. I want to wrap up on this very quickly and say the consequences for their failure to address these alternative holdings are quite clear. Hanna v. City of Dearborn Heights and a litany of other cases we cite, including White Oak Property Development State, if there are alternative bases for district court's holding and the appellant only addresses one of them, all of them are waived. There's a lot of ground on the statute of limitations that I would like to cover, but with about a minute 20 to go, I'm going to focus on two or three things. First one I'd like to address is Mr. Opolinsky said that it was unfortunate, quote, unquote, that the 92 specification used the word authorized. It was not unfortunate. It was intentional. The three-year schedule is released to the release and authorization. Secondly, this notice to proceed, the supposed notice to proceed, I say this with all due respect, it's a post-trial fabrication that should be rejected. But it is language in the 92 specification part three. Work shall begin within five days after Allied has received notice from U.S. Steel to proceed. Sure. And up above in the provision you pointed to, Your Honor, points out that we've got a three-year schedule running from the release and authorization. And here's the fact of the matter. There is no such document in the evidentiary record. Allied did not introduce any such notice to proceed. There is no such thing. There was no notice to proceed ever given in, like, a little document, like a little certificate notice to proceed? Absolutely not. The document that Mr. Opelensky referred to that he called a memo was actually an e-mail from Mr. Nuzzo to Allied about a variety of issues. It certainly was not a formal notice to proceed. Yeah, well, Allied says in their brief that that was his testimony, was that e-mail was the required notice to proceed. I see my time is up. May I briefly respond to that question? Please, yes. So there's one technical issue with that, and I think we pointed it out in our brief, is that Mr. Nuzzo was a U.S. still witness that Allied called out of order during their case in chief, and on the record the parties agreed that Mr. Nuzzo's testimony would not count for Allied's case with respect to directed verdict purposes. They agreed that his testimony would not count. So it is not part of the directed verdict record. I will say this, and then I will conclude. The words, notice to proceed, I looked at the record, the trial record, were not uttered a single time in Allied's case in chief, not once. If this is the document that is the be-all, end-all of the trigger for the statute of limitations accrual, I don't know why it wasn't brought up. Can they change their theory on appeal if they have a new theory that's a good theory and they were operating on a bad theory before? If it's all going to the statute of limitations, the same issue that was raised? Sure. I think that there would be a waiver issue if you don't make the argument in the district court. I don't know if sometimes you get into gray areas. There's one of the cases we cite that party talked about 2.2071 but not 2072, and is that waived? I don't think we have to get there, though, on this one, because there is simply no evidence in the record to support the notice of this notice to proceed. Thank you, Your Honor. We'd ask that the decision be affirmed. Let me hit this last issue first. When I use the word unfortunate about the word authorization, what I meant is that it created part of the confusion. The word authorization is used both in Section 3 of the final conformed specification and in the AIP. U.S. Steel in their brief admits that the work is governed by Section 3 of the final conformed specification, page 35. What they refuse to do is read that provision. That provision says we must receive a notice to proceed. That evidence needs to be looked at in the light most favorable to us. But did he says, and we should calm down so that we're not yelling at each other, he says that there was no evidence in the affirmative case in chief of a notice to proceed. Is that right or wrong? That's wrong, Your Honor. So what is the evidence that you would point us to? The evidence is precisely the testimony of Allied's president, testimony of their superintendent, Gordon Lindquist, and that memorandum. We do acknowledge that Mr. Nuzzo's testimony came in out of sequence, but we're not relying on his testimony for this. We're relying on the document and the testimony of our people. And under Section 3, it requires receipt. This must be credited. If it's not the July 16th memo by Tony Nuzzo, what is it? There has been no other notice to proceed offered. U.S. Deal claims we changed our theory. We have never changed our theory. The document that started this was the November 2011 claim that U.S. Deal requested. We said in there exactly what we're saying here. The claim started or the job started with that notice to proceed. We had three years. In the complaint, U.S. Deal claims that we didn't set forth this in the complaint. We absolutely did. Paragraph 32, Second Amendment complaint, it was not until July of 2006 that U.S. Deal finally made the sheet and tin facility available to Allied more than two years after the official facility was finally released. We said that in the complaint, we said it in the claim, and we said it throughout the case. It has always been Allied's theory. Now, let me hit the issue of the MSA. We believe this should go to the jury. The court indicated, as Judge Merritt has indicated, this was an unfortunate quilt work of different agreements that have to be patched together and read together. This is the paradigm case for, at a minimum, two reasonable interpretations that should go to the jury. The issue of having a non-refundable advance payment be refunded at a minimum smacks of an ambiguity or looking at the evidence not in the light most favorable. Arguably, there's not consideration given by your side. There was a wealth of consideration given, Your Honor. If you look at the agreement as a whole, U.S. Deal got three aspects of significant consideration. Number one, we reduced our claims in excess of $100 million for this AIP. Number two, for the $10 million advance, it served as a dollar-for-dollar reduction. They owed us 63, so in giving us that 10, it reduced it to 53. The dismantling advance reduced it to 43, and then we had to do $43 million worth of work. So you're talking about general consideration, but the particular paragraph dealing with this non-refundable advance payment says, in consideration of Allied's agreement to perform manufacturing work at Allied's facility in Youngstown. So are you saying, then, that the consideration is simply a promise? Allied agrees to perform manufacturing work as opposed to actual performance of manufacturing work. Yes, Your Honor, and for this reason, and it dovetails with their theory, you must read this in its entirety. At the inception of this deal, U.S. Deal said, we'll give you $63 million, $20 million cash, $43, you'll work it out. U.S. Deal didn't know if they would have $157 million in work to generate this $63 million in profit. So they said, instead of just dismantling, what if you agree to do other things like manufacturing? Allied said, well, we don't have a facility built. We're happy to do it. In case you don't have enough, we'll do it. So that language was put in there. We don't run from that. But what happened is it played out very differently than anyone expected. They had not only $153 million worth of dismantling to generate the $63 million in profit. They had it in four years instead of ten. So by the time Allied even got to the construction of his building, the profit gross margin commitment had been reached, had been made. And so we performed it as it played out. You're saying that we should reverse the summary judgment on this issue at the district court, grant it, and send it back on the theory that there's an ambiguity here? Absolutely, Your Honor. And have a trial on that subject? Absolutely, Your Honor. It's an ambiguous agreement. If you look at the one sentence that U.S. Deal looks at, you come to their conclusion. We believe if you look at the entirety of the ten-page agreement, you come to our conclusion for two reasons. Number one, if you look at the fulfillment language, this is all structured around 163 mil at work, 157 to get to 63. It says after 63 mil is reached, all bets are off. And $10 million rides on this issue? Yes, Your Honor, $10 million. And so number one, we believe if you look at the entirety, the intent was you can give us work. Was manufacturing a possibility? Yes. But it was just that. It could be manufacturing or dismantling. They gave us – Did this $10 million not receiving that have anything to do with a bankruptcy? Yes, Your Honor. When U.S. Deal attempted to enforce that agreement, it put my client into bankruptcy. Now getting to the interpretive issue, number one, we believe that one sentence U.S. Deal looks at has to be interpreted in the whole. And the whole was once you reach the 63, all bets are off. And it says once you reach 63, U.S. Deal has no obligation to give us any more work of any touch, of any nature or type. It identifies then the options. It says Allied can complete any work it's then doing, and it can enter into a new voluntary arrangement, which it did. U.S. Deal's interpretation not only ignores the 157 to make 63, but it also ignores the 10-year term because U.S. Deal is saying this is separate and apart. You could have made the 63. We still get our recovery. And so, in other words, even after we've gotten our 63 mil for 157, U.S. Deal is turning this into potentially a $300 million deal. Thank you for your argument. Sure. Would you address the waiver point with respect to the statute of limitations? I thank you for that opportunity. Frankly, we don't believe there has been a waiver. We acknowledge the case law. There simply was no articulated basis for these other rulings. At the directed verdict on summary judgment, the court identified an oral ruling which is entirely statute of limitations. The court indicated at that time, I will give a further ruling outlining my ruling. You have that ruling. It is entirely statute of limitations. And the last sentence— It does say that U.S. Deal is right on the merits on these other issues. Saying that I find merit in their arguments, we believe, doesn't constitute a holding or a ruling. She says in one sentence at the end, and for all the other reasons of U.S. Deal, it should be dismissed. What about your opponent's side of this case, U.S. v. Holland? How would you address that? I don't recall that case, to be perfectly honest, Your Honor. But I know the cases we've cited stand for the proposition that, of course, we have to address an alternative holding if it is articulated. No alternative holding was articulated. The court said the statute of limitations resolves all three, and that was the only basis. Are we supposed to guess at which of the arguments U.S. Deal raised she's granting it on? She said on all. So if you really wanted to protect yourself, you would address all. Well, but it was not only all, but there were multiple parts of those. And, in fact, the uncertainty is highlighted about what played out. The judge alluded to three other arguments of U.S. Deal but doesn't address them. U.S. Deal, in their brief, raises six arguments. So who knows what the rationale for the court. But in fairness to Allied and the court, they raised those. We believe they were never raised by the court. We addressed them in our brief. And if the court reads the brief, it will come to two conclusions. Number one, there's no merit in any of these so-called alternative bases. They were all addressed at the lower court and never briefed. And, second, they're not claim dispositive. Thank you. Thank you, Your Honor. Thank you for your argument. The case will be submitted. Would the court call the next case, please?